**CALLAHAN, Plaintiff-Appellant. v. WASMIRE, Defendant-Appellee.**

Common Pleas Court, Stark County.

No. 83819. Decided March 1943.

596

F. E. Hunter, Alliance, and Wm. T. Martin, Alliance, for defendant-appellee.

Robert Wilson, Canton, and Ira J. Warner, Cleveland, for Prentiss A. Brown.

## OPINION

By BARTHELMEH, J.

This is an appeal from the Municipal Court of the city of Alliance on questions of law. The action originally instituted in that court was one of forcible detention.

The jurisdiction of that court in cases of this nature is provided for in §1579-197 GC, which, in part, provides as follows:

"Jurisdiction in Civil Proceedings. Said Municipal Court herein established * * * shall have ordinary civil jurisdiction * * * in the following cases:

In all actions and proceedings of which Justices of the Peace or such Courts as may succeed Justice of the Peace Courts have or may be given jurisdiction."

By reason of the provisions of **Chapter 13 GC,** and particularly §10447, such jurisdiction was given to "any Justice within his proper county."

It is therefore obvious at the outset that the Honorable Harry W. Moreland, as judge of the Municipal Court of the city of Alliance, had full and complete jurisdiction to hear this cause.

While the appellant, who was the plaintiff below, files no assignments of error, this court will look to the whole proceeding and search the record to see if substantial justice has been done.

With this in mind, the questions to be decided are:

(1) Was the court correct in its sustaining the motion of the defendant at the end of plaintiff's case upon the premise that the court was "only determining the question of nuisance on the ground of immoral conduct" and limiting the proof to this single issue, and was this the limitation placed upon the court by the Canton Area Rent Office of the Office of Price Administration?

(2) Did the Canton Area Rent Office of the Office of Price Administration have legal authority to limit the powers and jurisdiction of the trial court, thereby depriving the plaintiff of any other cause of action she may have had, and stating the degree of proof necessary to sustain her cause of action, to which she was so limited by the Area Rent Office?

"Substantial justice cannot be done by a judgment which denies a party legal and constitutional rights." **Taylor v. Schlichter, 118 Oh St 131;** 160 N. E. 610.

There is ample authority in Ohio for a landlord to terminate a month to month tenancy at the end of any installment payment period or the end of the established month by the giving of proper notice. While this issue is not directly before this court, the record (letter of October 31, 1942, of Chief Rent Attorney) discloses that some such attempt was made by the owner of the premises by her refusal to accept a tender of rent. Whether or not the proper notice was given to the tenant is not revealed. However, without judicial authority, this plaintiff was denied the right to seek an adjudication of her rights in accordance with the laws of the State. To this rule of the rent attorney she adhered and proceeded no further.

Two subsequent petitions were filed with the rent office, seeking consent to commence an action in forcible detention.

In these this appellant charged:

(1) That the tenant is committing or permitting a nuisance.

(2) Is using or permitting a use of the housing accommodations for an immoral or illegal purpose.

(3) That the tenant has unreasonably refused access to the premises for legitimate inspection.

The Area Rent Office by some method not revealed by the letter of October 31, made a determination of these allegations. Was there a hearing? Did witnesses testify? Was there any consideration given to the quantum or quality of proof? These questions can, from the record before the court, be safely answered in the negative, since it is revealed that the chief rent attorney of the area dismissed the complaint in the following manner:

"In view of the period of occupancy involved in this matter and upon examination of the facts alleged by you, it does not appear to us that you have established a proper basis for eviction within the terms of the maximum rent regulations."

It is apparent to this court from this statement that the rights of the landlord as against the tenant was not considered in light of the laws of Ohio.

The rent attorney then finds that:

"There may well be a disputed issue of fact upon whether or not a legal nuisance exists or whether or not your tenant has made an illegal or immoral use of the premises.

We find no evidence of the tenant unreasonably refusing * * * access to the premises for inspection."

Thereafter follows the consent to have the rights of the owner of the premises "submitted for judicial determination" and that the Area Rent Office is "willing to abide by the court's determination thereof."

What has been consented to? What are the issues to which the trial court was limited by this consent? The answer to these two questions seems plain to the court. They are:

(1) Nuisance and of

(2) Illegal or immoral use of the premises.

The answer to the first proposition confronting this court is now apparent. The Area Rent Office did not limit the issues to "the question of nuisance on the ground of immoral conduct" as the court expressed itself immediately before sustaining the motion. The issues that the rent office consented to be "submitted for judicial determination were:

(1) Nuisance and of

(2) Illegal or immoral use of the premises."

True, there is no evidence in the record of "nuisance on the ground of immoral conduct." It might be here added that there was no evidence of immoral use of the premises. Further, it is here assumed that the term "illegal" here used referred to acts specifi-

cally prohibited by statutory law and applying this standard this court is bound to find that there was no evidence to support this charge, with the possible exception of §12646 GC. This section of the Code provides:

"Whoever * * * uses or maintains a building, structure or place for the exercise of a trade, employment or business, or for the keeping or feeding of an animal which by occasioning noxious exhalations or noisome or offensive smells, becomes injurious to the health, comfort or property of individuals or of the public, or causes or suffers offal, filth or noisome substance to be collected or remain in a place to the damage or preudice or (of) others, or of the public."

What is a nuisance in the law of torts?

"The term is derived from the French word "nuire" meaning to do hurt or to annoy, but it is applied in the English law indiscriminately to infringements upon the enjoyment of proprietary and personal rights.

It has been said that a nuisance is something obnoxious or offensive; that is, it is anything which unlawfully and tortiously does hurt, or causes inconvenience, discomfort or damage to another, and it consists in unlawfully doing an act or omitting to perform a duty, which act or omission damages, injures or endangers the comfort, repose, health or safety of others, offends decency or in any way renders other persons insecure in life or the use of property.

An actionable nuisance is defined by Mr. Cooley in his work on Torts to be anything wrongfully done or permitted, which injures or annoys another in the enjoyment of his legal rights." **30 O. Jur., Sec. 2, page 300.**

The statements above made by the text-writer are supported by numerous Ohio cases, the principal ones being **Cardington v. Frederick, 46 Oh St 442; 21 N. E. 766,** and **Railroad Company v. Carr, 38 Oh St 448.**

While the amount of annoyance necessary to constitute a nuisance cannot be accurately determined, the standard must be notions of comfort entertained by persons of ordinary sensibilities. **Columbus Gas & Light Co. v. Freeland, 12 Oh St 392. Weishann v. Kemper, 27 N. P. (N. S.), 269.**

Some search has been made for a reported case in Ohio upon the question of nuisance caused by barking of dogs, but nothing directly in point was found. However, in the case of **Seegnueller v. Pahner, 9 C. C. Rep. (N. S.), 333,** the court recognizes the possibility of such being a nuisance, when it states in the opinion at page 336:

"It might be a nuisance to keep a barking dog."

In the case of Commonwealth v. Perry, 139 Mass. 198, 29 N. E. 656, wherein the court considered the matter of a criminal nuisance under the laws of the Commonwealth of Massachusetts, the following pronouncement was made:

"A piggery in which swine are kept in such numbers that their natural odors fill the air thereabouts as to make the occupation of the neighboring houses and passage over adjacent highways disagreeable, is a nuisance."

Further in the opinion at page 201, the court approved the following language in its consideration of the trial court's charge:

"It is not necessary for the government to show that the contamination of the atmosphere is to such an extent as to cause actual injury to health, but it will be sufficient for it to show that the smells and stenches are so offensive as to render the residence and habitations in the vicinity uncomfortable."

In the case of Herring v. Wilton, 106 Va. 171, the court was called upon to consider the barking of dogs as a nuisance.

"Dogs in a neighbor's yard may effectually murder sleep and disturb the reasonable enjoyment of a home, and where great and continuous annoyance and discomfort are created by the howling and barking of dogs and the whining of puppies, and the rest of a neighbor and his family is disturbed and sleep is interrupted, and he is disturbed in the reasonable use and enjoyment of his property, a court of equity will interpose by injunction to enjoin and restrain the nuisance."

"A nuisance is anything which endangers life or health, gives offense to the senses, violates the law of decency or obstructs the reasonable and comfortable use of property." **State, ex rel. Pansing v. Lightner, 32 N. P. (N. S.) 376.**

Applying the law above stated to the record made, it is for this court to determine whether or not some evidence was offered by the plaintiff upon the issue of nuisance.

"In the consideration to be given such evidence, plaintiff is entitled to have the evidence construed most strongly in her favor." **127 Oh St 409, syllabus 3.**

Giving the evidence this construction, the plaintiff certainly

made proof of the existence of a nuisance sufficient at least that the sustaining of defendant's motion constituted such error that the same was prejudicial and she was denied substantial justice.

Surely, the keeping and raising of dogs under the conditions to which the plaintiff and a neighbor testified constituted a nuisance. The stench and smell caused by the keeping of dogs under the conditions testified to were "so offensive as to render the residence and habitations in the vicinity uncomfortable." Any odors so bad that "when you opened the door in the room it pretty near knocked you down" can and ought to be given consideration as a nuisance. Nothing in the record discloses that these premises were rented for anything other than the normal human habitation, at least not for the carrying on of the business of raising dogs. The cause of these odors is more than mere conjecture which certainly cannot be conducive to the good health of the occupants of this house, which included the appellant. This court feels that from the record made, plaintiff-appellant had just complaint.

The testimony of the witness, Tanner, also supports the claim of nuisance. While his testimony relates chiefly to noises made by callers, some reference was made to the dogs, that the "noise was caused by the dogs and the fellow that came there". Further in answer to a question concerning odors, "It was terrible, and she wanted to know what to do and I said I would send for the Board of Health."

Dogs do have their place, and this court is in no way condemning the dog as a pet. The fault here is not the dogs; it was the manner in which they were kept. Many things are not a nuisance in themselves, but their use and the manner in which they are kept can become a serious detriment to others in the community and thereby create a nuisance.

The second question is one that requires the attention of this court. It is obvious that the issue of the constitutionality of the act of Congress is not the question. The question is whether or not Congress by the Emergency Price Control Act of 1942 and the amendments thereto passed by Congress on October 15, 1942, confers power upon the Price Administrator to make a regulation such as was done by §1388.116, entitled "Restrictions on Removal of Tenant". Which regulation, as much as we are herewith concerned, provides as follows:

"So long as the tenant continues to pay the rent to which the landlord is entitled, no tenant shall be removed from any housing accommodations, by action to evict or to recover possession, by exclusion from possession, or otherwise, nor shall any person attempt such removal or exclusion from possession, notwithstanding that such tenant has no lease or that his lease or other rental agreement

has expired or otherwise terminated, and regardless of any contract, lease, agreement or obligaion heretofore or hereafter entered into which provides for entry of judgment upon the tenant's confession for breach of the covenants thereof."

This regulation, as it applies to this Area means that before a landlord can maintain an action in an established court, seeking the determination of their rights between themselves and their tenant, they must secure the consent of the Area Rent Office. This simply means that the Area Rent Office is telling the people when they may or when they may not seek a determination of their rights in court.

One wonders whether Congress ever intended that the mere pronouncement of a regulation by the Price Administrator should limit the jurisdiction of the local courts in the determination of issues purely local and having nothing whatever to do with the amount of rent charged for residence premises.

The administrator, in promulgating this regulation, points out §1388.120, title "Enforcement".

"Persons, violating any provision of this Maximum Rent Regulation No. 3, are subject to criminal penalties * * *."

This in itself is rather a strange idea that the pronouncement and regulation of an administrator can become a crime under the laws and the Constitution of the United States.

An examination of the act of Congress does not to this court reveal anything which either intended that the price administrator could or should regulate, control or limit the jurisdiction of local courts in matters relating to the tenancy, other than the price or amount of rent.

The title of the act provides:

"To further the national defense and security by checking speculative and excess price rises, price dislocations and inflationary tendencies and for other purposes."

The act in the purpose clause provides:

"It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war and the purposes of this act are, to stabilize prices and to prevent speculative, unwarranted and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding manipulation, speculation and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons

with relatively fixed and limited incomes, consumers, wage earners, investors and persons dependent on life insurance, annuities and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities and other institutions, and to the Federal, State and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in Section 3; and to permit voluntary cooperation between the Government and producers, processors and others to accomplish the aforesaid purposes. It shall be the policy of those departments and agencies of the Government dealing with wages (including the Department of Labor and its various bureaus, the War Department, the Navy Department, the War Production Board, the National Labor Relations Board, the National Mediation Board, the National War Labor Board, and others heretofore or hereafter created) within the limits of their authority and jurisdiction to work toward a stabilization of prices, fair and equitable wages and cost of production."

Attaching every conceivable assumption or conclusion to this portion of the act of Congress, can we arrive at any other conclusion but that Congress in its wisdom was attacking anything other than the threat of inflation. We must all agree that the ravages of inflation are as destructive to the war effort as military force. What Congress intended to do was to provide for the internal security so that the body of the nation could be possessed of its entire strength and force to fight the enemy beyond our shores and borders. Inflation becomes a problem created by scarcity of commodities and an abundance of the wherewithal to purchase or acquire such commodities. The terrible and devastating effects of inflation are many and varied, and it does not require the words or writings of learned men to point them out. No one, but the avaricious, would ever attack the wisdom of the act itself.

The controlling portions of the purpose clause apparently are:

"To stabilize prices and to prevent speculative, unwarranted and abnormal increase in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency."

Sub-section "B" of Section 2 grants authority to the administrator to fix maximum rents. Here Congress again concerned itself only with rents.

The act itself defines the term rent, Section 302 (g):

"The term "rent" means the consideration demanded or received in connection with the use or occupancy or the transfer of a lease of any housing accommodations."

Sub-section "C" of Section 2 provides for permissive variations in price or rent regulations. The term "rent regulation" at first sight would invite the examination of the reader that possibly here the administrator secured some authority for the regulation of the courts, but such is not a fact because throughout this entire sub-section, we find the terms "maximum price" and "maximum rent" and no reference to a regulation of the manner of occupancy.

Sub-section "G" under the title "Evasion" provides:

"Regulations, orders and requirements under this act may contain such provision as the Administrator deems necessary to prevent the circumvention or evasion thereof."

Can the circumstances or evasion here referred to mean anything but the price to be charged for rented housing quarters? What possible relation is there to the making of a regulation which gives the administrator the right to determine when an action in forcible detention may be brought, when his only concern under the act of Congress is purely the prevention, if possible, of inflation.

The act itself provides for certain prohibitions. Section 4, Subsection "A" provides in part:

"It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person to * * * demand or receive any rent for any defense-area housing accommodations, or otherwise to do or omit to do any act, in violation of any regulation or order under Section 2, or of any price schedule effective in accordance with the provisions of Section 206, or of any regulation, order, or requirement under Section 202 (b) or Section 205 (f) or to offer, solicit, attempt or agree to do any of the foregoing."

Sub-section "B" under the title of "Rent" provides that:

"It shall be unlawful for any person to remove or attempt to remove from any defense-area housing accommodations the tenant or occupant thereof or to refuse to renew the lease or agreement for the use of such accommodations, because such tenant or occupant has taken, or proposes to take action authorized or required by this Act or any regulation, order or requirement thereunder."

It is obvious that here is where the point was stretched in the mind of the administrator and upon which he assumed the author-

ity to make the regulation requiring landlords first to go to the area rent office to procure permission to institute actions in forcible detention. It is the opinion of this court, however, that one subsection under the title of "prohibitions" can be construed to deny such power to the administrator. This sub-section "D" provides:

"Nothing in this act shall be construed to require any person to sell any commodity or offer any accommodations for rent."

Does this not simply mean that where a tenancy known as month to month exists, that the offer to rent the same is not implied beyond each and every month and that such offer so to rent is implied only when the landlord is willing and does accept the established rent for the premises. This provision of the act without question means that the grocer cannot be compelled to sell a can of corn simply because the purchaser demands it; likewise the act means that the clothing merchant cannot be required to sell a suit of clothes or furnishings in his possession just because a customer makes a demand.

This provision of the act unquestionably authorized a person selling a commodity to close his doors and not offer anything in his possession for sale. Why should the administrator take a different attitude towards a landlord, especially when the limitation used the words "or to offer any accommodations for rent"?

The relation between landlord and tenant is one of contract. Where there is no lease for a specified time beyond a month, a new contract is made from month to month, terminable at the will of either the landlord or tenant. The only element of this contract that Congress sought to control was the "rent" or consideration. The elements of offer and acceptance were left to the parties.

It may be noted that Section 4(a) made reference to Sections 206, 202 (b) and 205 (f). An examination of these sections reveals that they have absolutely no relation to the question here considered, having already stated that the reading of the act of Congress in its entirety discloses that it was the intention of that legislative body that the purposes of this act are to avoid and guard against inflation.

Inflation has been defined to be "the disproportionate and relatively sharp and sudden increase in the quantity of money or credit or both relative to the amount of exchange business." Webster's International Unabridged Dictionary.

At first blush, one might arrive at the conclusion that this court has no authority under the Act of Congress to concern itself with a regulation because there is established in the act itself procedure for protesting. This procedure, as is established by Section 203-A provides:

"Within a period of sixty days after the issuance of any regulation or order under Section 2 or in case of a price schedule within the period of sixty days after the effective date thereof, specified in Section 206, any person subject to any provision of such regulation, order or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other evidence in support of such objections. * * *"

This requires a further inspection of Section 2 and Section 206. Nothing is found in Section 2 or Section 206 which does not specifically and unequivocally concern itself only with prices and rents. It would seem, therefore, that the act either did not intend such a regulation requiring a landlord to do certain things before seeking the jurisdiction of local courts in a forcible detention action, or Congress denied the right to make a complaint from such regulation. The last premise may be dismissed with the thought that Congress never intended to vest the administrator with any powers or authority which could not be reviewed by courts either provided in the acts or courts already established.

No provision being made for protest or appeal upon the issues here involved, it is proper to assume that courts already constituted are vested with jurisdiction to examine the acts of the administrator, not intended by the act of Congress, which apparently are void.

The act of Congress does create a court known as the Emergency Court of Appeals, Section 204 (c), which shall consist of three or more judges to be designated by the Chief Justice of the United States from Judges of District Courts and Circuit Courts of Appeals, and further provides that review may be had by the Supreme Court of the United States and makes this further provisions (d):

"The Emergency Court of Appeals and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals shall have exclusive jurisdiction to determine the validity of any regulation or order issued under Section 2, of any price schedule effective in accordance with the provision of Section 206, and of any provision of any such regulation order or price schedule."

An examination is required of Section 2 and Section 206 to determine what matters have been left to the exclusive jurisdiction of the courts referred to in Section 204(d). The very first portion, (a), concerns itself with a fixing of maximum prices and provides:

"Whenever in the judgment of the Price Administrator, the price or prices of a commodity or commodities have arisen or threaten to arise to the extent and manner inconsistent with the purposes of this act, he may, by regulation or order, establish such maximum price or maximum prices as in his judgment will be generally fair and equitable, **and will effectuate the purposes, of this act.**"

This section continues with numerous other considerations, but none are concerned with anything other than price. It occurs to this court that the words "will effectuate the purposes of this act" are controlling in the powers conferred upon the administrator.

Section 206 again concerns itself with nothing more than price schedules previously issued and nothing therein contained refers to anything but price. In fact, the word "price" appears eight times in the section. This agency of the executive department is commonly referred to as OPA, which of course means Office of Price Administration.

Does it not necessarily follow that the exclusive jurisdiction left to the courts provided in the act were those arising upon the validity of the regulations affecting price, and exclusive jurisdiction was not reserved to the questions involving the jurisdiction of courts already established to adjudicate matters other than price. This provision of Section 204 (d) throws further light upon the proposition that Congress had no intention of limiting in any way those elements of a contract having to do with offer and acceptance.

It does not appear to this court that Congress ever intended or did prohibit this court from considering the issue herein involved which has no relation whatever to the rent, price or consideration of a contract between landlord and tenant.

The constitutionality of this act has been questioned in several courts, both Federal and State, and exclusive of the courts referred to in the act.

In each of these assaults upon the act wherein the constitutionality was questioned, the issue was purely that of rent.

The United States District Court, Kansas, on October 23, 1942, in the case of Henderson v. Kimmell, declared the act to be constitutional. The United States District Court for the Northern District of Indiana, South Bend Division, in Roach v. Johnson, decided on February 25, 1943, declared the act to be unconstitutional.

In each of these cases the issue was purely price, rent and consideration. However, as has been previously pointed out, this court is not considering the validity of the act and it is therefore not necessary to consider the opinions of the courts above mentioned, except to point out that such issues were limited entirely to the issue of the act itself, namely, price control.

The issue here, as already pointed out, is not an assault upon the act itself. It is the consideration of the authority of the administrator to invade the jurisdiction of established State courts. The authority to pre-try issues determinable only in local courts, and as done here. The limiting of issues triable and fixing the degree of proof required to sustain the issues which the rent attorney authorized and permitted to be tried. Where is the reference in the act that gave such powers to invade the jurisdiction of established courts? This court fails to find its existence.

It is proper to herein note that the Canton Area Rent Office has been advised of this court's consideration of the second issue, and time given to March 22nd to intervene. No appearance has been entered or leave requested to file briefs or application made for oral argument by that time.

For the reasons herein stated, this cause is reversed and remanded to the Municipal Court of the city of Alliance, and upon the re-trial of this cause, the same shall be conducted in accordance with the established laws of this State, without any limitation of the issues or jurisdiction made or attempted to be made by the Canton Area Rent Office of the Office of Price Administration.